IN RE INTEREST OF HASTINGS.
STATE OF NEBRASKA, APPELLEE, V.
DAWN HASTINGS AND ROBERT HASTINGS, APPELLANTS.
318 N.W.2d 80

Filed April 9, 1982. No. 44314.

Thomas F. Dowd of Dowd & Fahey, for appellant Robert.

Deborah Cunningham, for appellant Dawn.

Donald L. Knowles, Douglas County Attorney, and W. Mark Ashford, for appellee.

Heard before Krivosha, C.J., Boslaugh, McCown, Clinton, White, Hastings, and Caporale, JJ.

Boslaugh, J.

Dawn Hastings and Robert Hastings, parents of a boy born May 7, 1978, appeal from an order of the separate juvenile court terminating their parental rights to their child.

Reports which appear in the record show that the child had been placed in a foster home after a "police pick-up." The child, who at that time was less than 1 year old, had been taken to the University of Nebraska Medical Center because he had been beaten. At that time the "left side of his face was swollen and bruised. His left eye was swollen completely closed and the white of the eye was bloody." His "left front tooth was knocked out and his mouth was cut and swollen. He was also bleeding from the gums."

A petition filed in the juvenile court on April 27, 1979, alleged, among other things, that the child had been observed suffering from injuries indicating that he had been physically abused. The petition prayed that appropriate orders for the care and custody of the child be made and that the parental rights of the appellants be terminated. At a hearing on May 22, 1979, at which the parents appeared in person and by counsel, the parents admitted the allegations referred to above. Other similar allegations referring to four previous occasions, and indicating abuse and neglect, were dismissed by the county attorney. The juvenile court continued the temporary custody of the child in Douglas County Social Services.

Dawn Hastings had been admitted to the Nebraska Psychiatric Institute on June 5, 1978, apparently suffering from schizophrenia. On the way to the hospital, she had attempted to jump out of a vehicle moving 30 miles per hour while holding the baby in

her arms. She was released on August 10, 1978, but readmitted on August 13, 1978. Prior to the readmission, the father discovered Dawn tumbling the baby in her arms and almost dropping him. She was transferred to day care on October 4, 1978, and has not been hospitalized full time since that date, but remains under commitment by the board of mental health.

Following a disposition hearing on July 26, 1979, the juvenile court ordered the parents to "comply with a plan designed to eliminate the conditions leading to the findings made in this matter." The plan established by the court required therapy for Dawn Hastings at the Nebraska Psychiatric Institute; conjoint therapy for Robert Hastings; attendance at Parents Anonymous; and cooperation with the court and Douglas County Social Services.

After a review hearing on February 4, 1980, the juvenile court ordered the parents to continue marriage counseling through the Nebraska Psychiatric Institute; to continue to attend the Positive Parenting group and become involved in the child development class offered by the American Red Cross; maintain regular visitation with the child; maintain employment or vocational training; pay child support as ordered by the court; maintain clean housing for themselves and the child; and continue to cooperate with the welfare authorities.

After a review hearing on May 28, 1980, visitation in the home of the parents for 3 hours per week was authorized, with a provision for weekly overnight visits if the visitation previously authorized proved to be satisfactory.

On September 5, 1980, extended visitation not exceeding 3 days at a time was authorized. The court also ordered that observation of interaction between the child and the parents by a child development specialist be arranged. A further review hearing was held on November 10, 1980, and visitation in the

parents' home from Friday morning until Monday morning was authorized. The matter was scheduled for review again in 3 months.

On January 30, 1981, on the motion of the guardian ad litem for the child, the juvenile court suspended visitation in the home of the parents, but permitted "ordinary visitation rights" for the father to continue. Prior to the hearing on this motion, counsel who had represented both parents was permitted to withdraw as counsel for the mother.

The record shows that the visitation in the home of the parents with the natural mother proved to be disastrous. The reports which were received in evidence at this hearing, together with reports received at the preceding hearings, demonstrated that the situation had deteriorated. The evidence indicated the child had been abused and neglected during visitation in the parents' home. The father stated to the social workers that it was unsafe for the child to be alone at home with the mother. The parents had not attended all of the parenting sessions as ordered by the court, and they had made but very little progress in developing the necessary skills and understanding to be able to care for the child.

Three reports by the guardian ad litem, dated January 15, January 26, and January 27, 1981, were received in evidence at the January 30, 1981, hearing. The guardian ad litem, who was present at the hearing, stated the reports were based on information he had gathered firsthand.

The January 15, 1981, report concerned a conference on January 7, 1981, at the home of the foster parents, attended by the guardian ad litem and Elise Wagoner, the foster care caseworker. This report stated in part: "The foster parents report that [the child] still comes home after extended visitations with his natural parents tired and cranky and hungry. He has on some occasions returned home with cuts and bruises. The Hastings have never admitted

any intentional harmful physical contact. The foster parents further state that [the child] repeats profane language and derogatory comments that he hears at the home of his natural parents. Further, that since the period of visitation has been extended, [the child] returns to the foster home with very poor deportment and is almost uncontrollable at times, and that it takes a day or longer to return him to the reasonable discipline that the foster parents have tried to instill in [the child] since their relationship began.''

Attached to this report was a three-page report by the foster parents, detailing the problems encountered after the child had made visitations in the parents' home between November 14, 1980, and January 5, 1981. Following these visitations, the child would be returned to the foster parents dirty and frequently ill. The child would be tired, cranky, and very difficult to control for the first day or two after a visitation.

Evidence of physical abuse during these visitations consisted of puncture marks on his face and bruises on his stomach, right knee, right upper thigh, and under his right eye. After a visitation the child would ''hold his hands up to his head, as if he is expecting to get hit in the head'' after doing something wrong. He exhibited increasing resistance to being taken to his parents' home for the visitations.

The report of January 26, 1981, detailed the result of a meeting on January 24, 1981, at the home of the mother of the child's father. According to this report, the father stated in the presence of the guardian ad litem, the Child Protective Services caseworker, and his mother that ''he wanted he and Dawn to never have the child back and that it was dangerous for [the child] to be there when he is not because Dawn does not properly care for him. He said that she rarely, if ever, left the house without him (Bob); that she keeps the drapes and shades

drawn all day long and exercises very little discipline over [the child] except when she is excessively angry or irritated with him. He said she sleeps alot [sic] during the day, leaving [the child] unattended or forcing him to sleep as well. She stays up until between 2:00 and 4:00 a.m., nightly watching television and is not responding to Bob in a way he thinks a wife should.

"He said the meals prepared for himself and [the child] are not well balanced but are single item meals. She rarely fixes meals which forces Bob to prepare the evening meal and most breakfasts which he does not feel should be part of his duties on a regular basis.

"He related that Dawn gets exceptionally irritated with [the child]; uses foul language in denouncing him and has very little control over him. Dawn has apparently stated on many occasions that she wished she did not have to put up with Bob at all and that [the child] was an unbearable problem. (These are not the exact words but is an accurate accounting of what was said).

"Mr. Hastings does not intend to continue the marriage and believes Dawn is not capable of properly caring for [the child]. He understands that the foster family is having serious disciplinary problems with [the child] and recognizes that [the child] goes back to the foster family, on some occasions, not clean, hungry and tired. He believes that it is not in the best interests to even let [the child] be returned to the Hastings home for any kind of visitation.

"Bob requested that a meeting be set up as soon as possible with Judge Moylan to relate to him, personally, what he has said to us . . . ."

The report of January 27, 1981, stated as follows: "On this date I received a call from Joan Muehling during which she related that when [the child] came back from visitation with the natural parents, she [sic] said 'Mommy-Dawn slapped me.' He also

said that Dawn had spanked him. He rubbed his behind indicating that it was tender and sore.

"Upon removing his trousers Joan saw the imprint of a hand on the buttock, on the left side. She said she had taken a picture of it but it was not yet developed.

"When Joan was undressing [the child] for sleep, as she was removing his belt, [the child] became very animated and afraid of the belt; and asked that he not be spanked. Joan called Elise Wagoner to report the incident but Elise Wagoner was out of the office, sick, but a message was left.

"Further, Joan relates that last week [the child] was sick during the time he was with his natural mother. He had cold symptoms and flu symptoms. When Dawn Hastings brought [the child] back to the foster parents, his hair was wet and he was not properly clothed for the prevailing weather."

The situation was further complicated by a deterioration in the relationship between the parents themselves. Their conduct toward each other was characterized by verbal and physical violence and the father was considering divorce.

A report of the guardian ad litem, received at the hearing on November 10, 1980, described some of the conduct of the child's parents in their home. The report, which was based on a telephone interview on November 7, 1980, with a neighbor of the parents, stated: "Pam told me that she did not wish to become a witness in the above captioned matter and would get a medical excuse if necessary to avoid having to testify. She did, however, say that during the entire time that Bob and Dawn lived above her, they were constantly fighting—both verbally and physically. She stated that they had always used extremely foul language directed at each other and there were many times when the screaming became so intense and the sounds of body contact against the walls and floor that she could not take it and had to

leave. She stated further that she sought medical attention for a nervous condition caused by the antics above described and that her problem had in fact been diagnosed to be caused thereby. She stated that she actually had to leave town because Bob and Dawn had personally threatened her with physical harm for talking to court appointed personnel relating to the matter involved herein. She stated that when she returned after Bob and Dawn had moved away that she became much better almost immediately.

"She stated that she had at least one very long conversation with Bob Hastings early in the year of 1980, at which time he confided in her his fear of staying in the marriage and his knowledge that it is unsafe for [the child] to stay in such an environment. She could not help over hearing the content of many of the arguments between Bob and Dawn. She overheard Bob telling Dawn on many occasions that he would leave her; that he had another woman; and that he couldn't stand her any longer. Pam Willert states that these arguments and similar words were heard up to and including the date on which Bob and Dawn moved to their present home."

At the final hearing on March 24, 1981, the parental rights of both parents were terminated. A four-page report of the court service officer, received at this hearing, summarized the developments in the case since April 27, 1979, and contained the following conclusion and recommendation: "This case was filed on April 27, 1979. Although numerous services have been made available to Mr. and Mrs. Hastings, the situation has not changed. Recent events during extended home visits have shown that [the child] is still in danger in his natural parents home and further that the parents ability to care for their child has not improved. Further evidence of this unchanged situation was clearly indicated during my conversation with Mrs. Hastings on

March 6, 1981, at which time she totally denied that there were any marks or bruises on [the child] when he left the home on the last extended weekend visit of January 24th and 25th.

"[The child] has been in foster care for twenty-two months and is two and a half years old. It is extremely important that permanent plans be made for [the child] and that he is given the opportunity to live in a safe, secure and stable environment. Therefore it is this Service Officer's recommendation that the parental rights of Dawn and Bob Hastings over [the child] be terminated."

A report of the Child Protective Services worker, dated February 10, 1981, received at this hearing, stated in part: "Child Protective Services has maintained contact with Dawn, Robert and [the child] for the purpose of supervising the weekend visits arranged by foster care. My visits took place on 11/6/80, 11/29/80, 12/4/80, 12/6/80, 12/19/80, 1/3/81, 1/10/81, 1/23/81 and 1/24/81.

"During these visits I found Dawn's behavior inappropriate when interacting with myself. Some examples are her leaving the room and going to take a nap, and her continuous playing with the television set. On all visits Dawn was not willing to talk with me in regards to any problems she may be having with [the child]. Dawn rarely spoke with me other than a response to a direct question. Dawn's responses were either 'fine', 'it's none of your business because it doesn't pertain to the court order', or 'I will have to talk to my attorney'.

"According to Robert, everything was not fine and they were still having serious marriage problems and some problems with [the child]. Robert explained to me on the visit on 1/10, that it was hard trying to talk with me about their home problems around Dawn and wanted to talk with me privately. On 1/24/81, he arranged for me to meet with him and his mother, Mrs. Gunn, at her home. Also present

was the Guardian-ad-litem, Mark Trustin. Robert stated at this visit that nothing has changed between him and Dawn. They were still having serious marital problems and he was preparing for a divorce. He had not seen any change in Dawn in regard to her responsibilities as a wife or mother. Examples are: 1) Her not preparing balanced meals, which forces Robert to prepare the evening and most of the breakfast meals, which he feels shouldn't be his regular responsibility; 2) Dawn will rarely leave the house without him and she keeps the drapes and shades drawn all day; 3) Dawn sleeps mostly during the day, leaving [the child] unattended or forcing him to sleep also. Robert also stated at this visit that Dawn gets very irritated with [the child] during the weekend visits. She uses foul language and has very little control over [the child's] behavior. She makes statements like she wishes she didn't have to put up with Robert, or [the child] was just a problem. During this visit, Mrs. Gunn related an incident that happened on December 14, 1980. See attached letter signed by Mrs. Gunn." (The letter referred to and attached to the report related an incident during which the mother continually referred to the child as "you f------ kid.")

"The court is aware of the abuse of [the child] which led to the supervision of Dawn's visits with [the child]. On 2/10/81, I had a telephone conversation with Robert Hastings regarding the incident on the weekend of January 23rd. Robert stated that on Saturday or Sunday about 4:30 p.m., Dawn hit [the child] with her hand on his 'rear' because he wouldn't eat. He said that he was in the living room watching T.V. when the incident happened.

"The Child Protective Services staff has been intensively involved with the Hastings family since July of 1978. [The child] has been in foster care since April of 1979 (22 months). This worker has been involved with this family since August 27, 1979

(18 months). Numerous services have been made available to the Hastings to aid them in improving their parenting skills. Recent events have shown that [the child] is still in danger in his natural mother's care. Mr. Hastings recognizes the situation but has failed to establish a safe environment for [the child]. Permanent plans need to be made as soon as possible in [the child's] behalf. I'm recommending that [the child] remain in foster care and therefore recommending that parental rights be terminated so that a permanent situation can be established for this child."

A later report of the Child Protective Services worker stated: "I have not had any face-to-face contact with the Hastings since January 30, 1981, when Dawn's visitation with [the child] was suspended. A home visit was attempted on February 19, 1981 without success. I've had two separate phone conversations with both Dawn and Robert Hastings.

"On three different occasions (February 10th, February 17th, and February 27, 1981) Dr. Ann Taylor, Mark Trustin, and myself attempted to have a conference with Robert Hastings. Robert never showed up for any of the scheduled appointments. Robert has made no attempts to visit with [the child] since the hearing on January 31, 1981.

"My recommendations remain the same as stated on my prior report to the court dated February 10, 1981."

The report of the foster care worker, received at this hearing, made the following recommendation: "[The child] has been in foster care for twenty-two months. Since his placement, Child Protective Services, the court and foster care have attempted to work with his parents to aid them in their parenting skills, including weekend visits. However, after the weekend of January 25, 1981, when [the child] returned with bruises and other marks, it would ap-

pear that few, if any, positive changes have been made. As [the child] is now two and a half years old, it is important that permanent plans be made for him and that he be given the opportunity to live in a safe, stable environment. Therefore, I recommend that [the child] remain in foster care and that the parental rights of Robert and Dawn Hastings be terminated so that [the child] may have a stable, secure and safe environment."

The reports of the child psychiatrist, received at this hearing, indicated the child exhibited significant behavioral problems, showed the effects of "poor socialization and disruptive care" during the past 2 years, and now required therapy. The letter to Judge Moylan, dated February 17, 1981, stated in part: "At this time my recommendations would be: 1) To attempt to get the father to relinquish his parental rights on [the child], which would allow [the child] to be adopted. 2) To continue to work with [the child]. [The child] shows a lot of effects of poor socialization and disruptive care over the past two years, and whether he is returned to the parents or remains in foster care, [the child] is going to need some play therpay [sic] to help remedy these problems. The foster mother does report a lot of the disruptive behavior in their home. 3) To allow [the child] to have a stable environment. At this time I think that Dawn should show significant changes on her own and allow [the child] to stay in long term foster care before any consideration be given to [the child] being returned to her."

The letter of March 19, 1981, to the guardian ad litem stated as follows: "This letter is in regard to [the child]. I hope that you will get it to the proper person. [The child] was evaluated in my office along with his parents in regards to visitation and termination of rights. As I have worked with [the child], there are several concerns I have. He is confused. The chaos that [the child] has been put

through in the last couple of years is showing up in significant behavioral problems with [the child]. I feel that [the child] could benefit from some individual therapy and coordinating this with seeing the foster family. I do feel that [the child] has some inappropriate ways of relating to adults and other people. He does need some help with his inappropriate behaviors like soiling his pants when he is upset. [The child] does not trust anybody.

"Diagnosis: Undersocialized aggressive reaction of childhood.

"My recommendations for [the child] would be individual therapy until we can work through some of the behavioral adjustments. Even if the rights are terminated with the parents, [the child] should have therapy."

The report of the guardian ad litem, received at this hearing, stated in part: "Three meetings in the office of Ann Taylor, psychiatrist, were scheduled with Kathy Jones and Bob Hastings. Bob Hastings did not appear on any occasion, although he had received notice and his attorney had been alerted.

"I spoke this date with Mrs. Muehling, foster mother. She advises that since January 30, 1981, the date of the hearing when the Court suspended visitation by the natural mother, Dawn Hastings, there has been marked improvement in [the child's] behavior and general emotional state. She stated that since the time of the last visitation prior to the hearing of January 30, 1981, [the child] had experienced nightmares almost on a nightly basis which lasted until approximately March 9, 1981. The nightmares relate directly to [the child's] fear that he would be pinched or struck with a belt. Mrs. Muehling said that she, on these occasions, had to comfort [the child] and stay with him most of the rest of each night. Mrs. Muehling said that she has been trying to reinforce a more secure feeling in [the child]; that she and her husband would never pinch or strike

him.   [The child] recently told her that he knows that she would not hurt him, that it was Dawn who pinched him.

"She further relates that [the child] does what he is told more regularly and no longer relieves himself in his clothes, and does not use fowl [sic] language nearly as much since visitation was suspended. Mrs. Muehling talked with Ann Taylor who suggested that [the child] begin some therapy treatments with her for proper socialization training.

"Mrs. Muehling says that [the child] does not mention Bob or Dawn, anymore.

"I have received a copy of the psychiatric report from Ann Taylor, dated February 17, 1981.   Note particularly that, in her estimation, Dawn is not 'capable of making any significant changes.'   That she further has not seen Dr. Stan Moore for evaluation that was suggested at the outset.   Further, that it is her belief that [the child] should be adopted outside of the natural parents and that [the child] needs further therapy.   Although Ms. Taylor suggests a possibility that Dawn may yet make significant changes in the last paragraph of her report, she told me in her office in the presence of Kathy Jones that she does not believe Dawn Hastings has the inherent ability, nor any other skills, which would enable her to become a proper or appropriate mother for [the child].   She stated that it is her belief, based on her examinations and study that [the child] should not be returned to the family home either on a visitation basis or a permanent basis.

"Since the hearing of January 30, 1981, the natural father, Bob Hastings, has not made any effort to make contact with [the child]."

The record as a whole establishes that the best interests of the child required that the parental rights of both parents be terminated.   The child had been in foster care for nearly 2 years and was almost 3

years of age. Instead of improving, the situation had deteriorated.

Three members of the court are of the opinion that the judgment of the juvenile court should be reversed. The effect would be to condemn the child to indefinite foster care. There is no substantial evidence from which it could be concluded that either parent will ever be able to care for the child.

It is the rule in this state that foster care is a temporary measure to be utilized only for the purpose of maintaining the child until a permanent disposition can be made.

In *State v. Tibbs,* 197 Neb. 236, 243, 248 N.W.2d 330, 334 (1976), we said: "Although the appellant would like additional time to demonstrate his ability to properly care for his children, we point out that this litigation has been pending for approximately 2 years, and the best interests of the children require that it be brought to final conclusion without further delay."

In *In re Interest of McKee,* 208 Neb. 623, 629, 304 N.W.2d 918, 921 (1981), we said: "The rule is well established that when natural parents cannot rehabilitate themselves within a reasonable time after the adjudication hearing, the best interests of the child require that a final disposition be made without delay." See, also, *In re Interest of Farmer,* 210 Neb. 500, 315 N.W.2d 454 (1982); *In re Interest of Levey, ante* p. 66, 317 N.W.2d 760 (1982).

In the *Levey* case, we said at 72, 317 N.W.2d at 764: "We agree with the juvenile court that the children's status cannot remain in limbo forever."

In *State v. Souza-Spittler,* 204 Neb. 503, 511, 283 N.W.2d 48, 52 (1979), we quoted with approval from an opinion of the Iowa court as follows: "As stated by the Iowa Supreme Court: '* * * we will not gamble with the child's future; she cannot be made to await uncertain parental maturity.' Long v. Long, 255 N.W.2d 140 (Iowa, 1977). Here, after 2

years, the objectionable conditions persisted."

As we stated in the *Levey* case, a child needs some sort of permanence in his life before it is too late. It is time to provide a stable home for the child involved in this case.

The parents in this case were given all assistance that was possible. Extended visitation was attempted, with disastrous results. The mother is incapable of caring for the child. The father has failed to demonstrate that he could care for the child by himself and has not suggested any plan or arrangement which would permit the child to remain in his care alone. Under these circumstances, the juvenile court had no alternative but to terminate the parental rights of the parents. The judgment is affirmed.

AFFIRMED.

KRIVOSHA, C.J., dissenting.

I find that I must once again regrettably dissent from the majority. My basis for dissenting is not that I am unconcerned about the welfare of a child but, rather, that I am compelled to recognize the limited role a court can play in making the world a perfect place in which to live. There is no question, as noted by the majority, that the child in this case was not blessed with perfect parents. Quite to the contrary, it is apparent that the child is a product of parents who themselves will undoubtedly have difficulty making their way through life. But the unfortunate truth of the matter is that they are not unlike scores of parents whose parental rights are not terminated.

As I have on previous occasions, I do not suggest for a moment that the parents here be granted unsupervised custody or control of the child. Indeed, I believe that the child must remain under the custody of the State. It is simply with the final step of terminating parental rights with which I disagree.

While it is true that the child has been in foster

care for several years, it is likewise true, as reflected by the court record, that at each hearing up until the hearing of January 30, 1981, the parents were praised for their sincere efforts in attempting to correct the situation. They were given extended rights of visitation and commended for their dedication and efforts. Yet, based upon the affidavits of the guardian ad litem dated January 30, 1981, indicating that the child had been spanked on his bottom and was inclined to use words which, while usually not uttered in court, are now found regularly in most movies and in almost all books, the parental rights are thereafter terminated on March 24, 1981.

The action taken by the court with regard to the mother seems better supported by the record, although the evidence is scant as to whether the mother's condition is not likely to improve in the future. But evidence regarding the father sufficient to terminate his rights is totally lacking. We are offered no evidence to support our terminating his rights.

The precipitating action in this case was the fact that the father was contemplating obtaining a divorce. While, to be sure, that in and of itself causes further instability to the family relationship and may prolong the time when the child may return to one or both of the natural parents, it does not occur to me to be sufficient to terminate parental rights, particularly that of the father, in this case. We have repeatedly held that the evidence necessary to justify parental termination must be clear and convincing. *State v. Souza-Spittler,* 204 Neb. 503, 283 N.W.2d 48 (1979); *State v. Hamilton,* 204 Neb. 537, 283 N.W.2d 66 (1979). Yet the record in this case is neither clear nor convincing. The record is simply that everyone is growing tired of the effort which must be exerted if success is ever to be realized. In my view, all of the alternatives have not yet been sufficiently exhausted and the parental rights of at

least the father should not have been terminated. In view of that fact, which would make the child ineligible for adoption at this time, I likewise see no purpose in terminating the mother's parental rights. I would have continued the foster care program at least until I could determine what the situation between the parents would be and what indeed would be in the best legal interests of the child.

WHITE and CAPORALE, JJ., join in this dissent.