IN RE INTEREST OF REBECCA ROMAN, A MINOR CHILD.
STATE OF NEBRASKA, APPELLANT, V. ANGELITA ROMAN,
APPELLEE.

327 N.W.2d 36

Filed December 3, 1982. No. 81-879.

Gary L. Schacht, Deputy Hall County Attorney, and William A. Francis, guardian ad litem, for appellant.

James H. Truell of Ahlschwede and Truell, for appellee.

Heard before KRIVOSHA, C.J., BOSLAUGH, McCOWN, WHITE, HASTINGS, and CAPORALE, JJ.

PER CURIAM.

This appeal arises from an action for the termination of the parental rights of Angelita Roman in her infant daughter, Rebecca. The county court of Hall County, Nebraska, found that parental rights should be terminated. Termination was based on a finding that the child had been adjudicated a neglected and dependent child through the fault of its parents and "reasonable efforts, under the direction of the court, have failed to correct the conditions leading to the determination." Neb. Rev. Stat. § 43-209(6) (Reissue 1978). Angelita appealed to the District Court, which affirmed the order of termination. Upon a motion for new trial the District Court granted a new trial and reheard the case, receiving into evidence the record of the previous proceedings in the county court and additional evidence. The District Court then reversed the order of the county court and remanded the cause to the county court for further "dispositional hearings." The District Court

did not reverse the county court's adjudication made on November 1, 1979, finding that Rebecca was a neglected and dependent child under the provisions of Neb. Rev. Stat. § 43-202 (Reissue 1978). The State has appealed from the order remanding the cause to the county court for dispositional hearings.

The State makes the following assignments of error: (1) The District Court erred in reversing the county court's order terminating parental rights. (2) The District Court erred in receiving, over objection, testimony concerning an alleged change in circumstances which occurred after the court's order terminating parental rights. Angelita, of course, takes the contrary position and, in addition, urges that the order of the District Court remanding for further hearings is not a final and appealable order within the provisions of Neb. Rev. Stat. § 25-1902 (Reissue 1979).

Our review of the matter is governed by the following principles. The action of the District Court is reviewable de novo in this court. If, however, the evidence is so conflicting as to be irreconcilable, we consider the opportunity of the trial court to have observed the witnesses and judged their credibility. *Grant v. Doeschot,* 189 Neb. 121, 201 N.W.2d 252 (1972); *State v. Worrell,* 198 Neb. 507, 253 N.W.2d 843 (1977). Under § 43-209 a person's parental rights may be terminated only upon proof by clear and convincing evidence. *In re Interest of Kimsey,* 208 Neb. 193, 302 N.W.2d 707 (1981).

We first deal with Angelita's contention that the order of the District Court remanding the cause to the county court for further dispositional hearing is not a final and appealable order under § 25-1902. That statute provides: "An order affecting a substantial right in an action, when such order in effect determines the action and prevents a judgment, and an order affecting a substantial right made in a special proceeding, or upon a summary application in

an action after judgment, is a final order which may be vacated, modified or reversed, as provided in this chapter." To support her contention Angelita cites *Martin v. Zweygardt,* 199 Neb. 770, 261 N.W.2d 379 (1978). The cited case was an action for damages for breach of warranty in the sale of a tractor. The county court held the evidence was insufficient to support the petition and dismissed the action. On appeal, the District Court determined otherwise and remanded for a new trial. In discussing the applicability of the statute, we said at 771, 261 N.W.2d at 380: "An order which affects a substantial right in an action and in effect determines the action is a final order. § 25-1902, R.R.S. 1943. When the substantial rights of the parties in the action remain undetermined and the cause is retained for further action, the order is not final. Barry v. Wolf, 148 Neb. 27, 26 N.W.2d 303. Prior to the enactment of section 25-1315.03 in 1947, an order of the District Court granting a new trial in that court was not an appealable order. Egan v. Standard Oil Co., 132 Neb. 518, 272 N.W. 327.

"The order in question here vacated the judgment of the county court and remanded the cause for a new trial in the county court. The general rule is that a judgment of reversal with a remand for further proceedings is not final for the purposes of appeal. See, 4 Am. Jur. 2d, Appeal and Error, § 59, p. 580; 4 C.J.S., Appeal and Error, § 152(i), p. 506." We there held that the order remanding to the county court for a new trial was not a final and appealable order under § 25-1902. Implicit in our holding was the conclusion that Neb. Rev. Stat. § 25-1315.03 (Reissue 1979), which, among other things, makes an order granting a new trial an appealable order, does not apply where the District Court remands to the county court for that new trial.

After considering the purpose of our previous holding in *Martin v. Zweygardt, supra,* and examining

various statutes (including those already mentioned) which are in pari materia, i.e., they all relate to appeals from the District Court or separate juvenile court to this court, we conclude that our holding in *Martin v. Zweygardt, supra,* is not applicable to the present situation.

First, we observe that there is no separate statute governing appeals from the county court sitting as a juvenile court to the District Court. Neb. Rev. Stat. § 43-202.03 (Reissue 1978) provides that such appeal shall be made in the manner "as in civil cases." Neb. Rev. Stat. § 24-541 (Reissue 1979) provides in part: "In all cases not otherwise specifically provided for, either party may appeal from the final judgment of the county or municipal court to the district court of the county where the judgment was rendered. All such appeals shall be de novo on the record except . . . [matters described in Neb. Rev. Stat. § 30-1606 (Reissue 1979)]. In matters appealed de novo on the record, the district court may, in its discretion, receive additional evidence if the court determines that such evidence is reasonably necessary to determine the issues, make findings of fact and render judgment thereon. The district court may affirm, modify, or vacate the judgment, or may remand the case to the county or municipal court for a new trial."

Appeals from the separate juvenile court are governed by Neb. Rev. Stat. § 43-238 (Reissue 1978). It provides: "Any final order or judgment entered by a separate juvenile court may be reviewed by the Supreme Court of Nebraska within the same time and in the same manner prescribed by law for review of an order or judgment of the district court; *Provided,* that when appeal is taken from a finding by the juvenile court severing parental rights, the cause shall be advanced for argument before the Supreme Court, and the Supreme Court shall, in order to expedite the preferred disposition of the case

and the child, render the judgment and write an opinion as speedily as possible.''

It should be noted that §§ 43-202.03 and 24-541 contain comparable procedural provisions. If § 43-202.03 is read with absolute literalness, there could never be any appeal to the Supreme Court until the judgments of the county court sitting as a juvenile court and the District Court are in agreement, for the statute says: ''Upon determination of the appeal, the district court shall remand the case to the county court for further proceedings consistent with the determination of the district court.'' On the other hand, the provisions for appeal from the separate juvenile court to the Supreme Court cannot be read to provide for such circular proceedings. It would be anomalous to treat identical orders of the two juvenile courts differently, i.e., if the separate juvenile court enters an order granting a new trial it is final and appealable, and if the District Court on an appeal from the county court sitting as a juvenile court grants a new trial (as it did in this case—with no appeal being taken), the order is appealable, but if it remands to the county court then the order is not appealable. We point out that §§ 43-202.03, 43-238, and 24-541 are not concerned with defining final or appealable orders. Having examined the related and pertinent statutes, we conclude that the order of the District Court remanding to the county court is a final and appealable order under the provisions of § 25-1902. *Martin v. Zweygardt,* 199 Neb. 770, 261 N.W.2d 379 (1978), insofar as it might be applied to appeals in juvenile matters, is distinguished.

We note in passing that some of the statutes pertinent in this case have since been repealed, amended, or the number changed. Section 24-541 has been repealed. 1981 Neb. Laws, L.B. 42. Neb. Rev. Stat. § 24-541.02(2) (Cum. Supp. 1982) provides: ''Satisfaction of the requirements of subsection (1) of this

section shall perfect the appeal and give the district court jurisdiction of the matter appealed, except that in appeals from the county court sitting as a juvenile court the county court may act in accordance with section 43-202.03.'' Section 43-238 is now § 43-2,126 (Cum. Supp. 1982). A separate juvenile code has been adopted, Neb. Rev. Stat. §§ 43-245 et seq. (Cum. Supp. 1982). That code applies both to the separate juvenile court and the county court sitting as a juvenile court. § 43-245(4).

We now examine the record de novo to determine whether the evidence supports the order of termination by clear and convincing evidence. There is little conflicting evidence in the record. The record indicates that Rebecca was born on August 14, 1979, to Angelita, age 19, an unwed mother. On September 13, 1979, pursuant to an order of the county court, Rebecca was placed in the custody of the Hall County Department of Public Welfare. The circumstances leading to this order were that Angelita and her baby were found about September 5, 1979, living in a shed adjacent to the home of Angelita's parents. The shed had no lights, heat, water, or sanitary facilities. Its only furnishing was a bassinet for the baby. Angelita's testimony was that her parents had ordered her out of their home, a two-bedroom residence in which nine other people were living. By the order of September 13, the physical custody of the child was placed with Mrs. Le Anderson, who the record shows is an experienced and capable foster parent. Arrangements were also made for Angelita to live with Mrs. Anderson. Apparently Angelita, with her baby, had been in the Anderson home from September 6 through 8 and on September 11. Angelita left voluntarily and thereafter did not take advantage of the arrangements to live with her child.

On November 1, after a hearing, Rebecca was adjudged by the county court to be a child who lacked proper parental care by reason of the fault or habits

of the parents. At the hearing on November 1 the testimony showed that after Angelita left the Anderson home she lived at a motel with one Steve James (not the father of the child). The evidence also showed that Angelita did not have the knowledge necessary to properly care for the infant. She did not know how to properly feed, cleanse, diaper, bathe, or medicate the child. Specifically, she did not know how much food the child needed and lacked the patience to feed the child the necessary amounts. According to Mrs. Anderson, the child was difficult to feed and it took special effort to see that the child was sufficiently fed. Mrs. Anderson testified that Angelita was absolutely not capable of caring for Rebecca. She could, however, be taught to care for the child, as she had the necessary intelligence. The clear inference to be drawn from the evidence is that, except for the State's intervention, serious damage to the health of the child would have resulted. Angelita, during most of the time here involved, had regular employment but no means for caring for the child while at work.

At the conclusion of the hearing of November 1 the court ordered that legal custody of the child remain with the Hall County Department of Public Welfare. On January 30, 1980, a dispositional hearing was held. Following this hearing the court continued legal and physical custody in the Hall County Department of Public Welfare; directed that Angelita attend parenting classes for a period of 6 weeks beginning January 31, 1980; "that the mother of the minor child spend a minimum of one morning per week in the home of Mrs. Le Anderson for the purpose of learning to feed, bathe and care for her child"; and "That upon the expiration of forty-five (45) days from this date, the temporary physical custody of the minor child be placed with her mother, Angelita Roman, without further order of the Court."

On March 17, 1980, Angelita received custody of the child and had custody for 2 days. During that time she was employed at a restaurant and was still living with Steve James. During the short time she had custody she reported to fellow workers that Steve James was physically abusing the child. This led to the removal of the child from her custody and to the filing of another petition which alleged that James was physically abusing the mother and placing the child in physical danger, and that the mother refused to remove the child from the dangerous situation. Angelita generally denied that petition.

A hearing was held on the petition on April 10, 1980. The State introduced evidence of Angelita's statements to disinterested third parties that James was abusing the child. The abuse consisted of sticking his fingers in the child's nose to keep the child from crying and picking up the playpen and dumping the child on the floor. Le Anderson also testified. She stated that Angelita was to have the child returned to her on March 15, but called on that day and said Steve was drunk and she was afraid to take the baby on that day. Consequently, Angelita did not pick up the baby until the 17th. During the period from January 30 to March 17 Angelita saw the child only five times and on only two of those occasions did she participate in the care of the child. James testified and denied abusing the child, stating that on the occasion of the alleged nose and finger abuse he was merely playing with the baby. He further explained the playpen incident by stating it was an accident and that Angelita had exaggerated and made up the other version because she was jealous about his talking to some of his ex-girl friends. He stated that he and Angelita had plans to get married. Angelita denied that James came home drunk, and she related a version of the other incidents which coincided with James' version, and essentially claimed she lied in what she told the disin-

terested witnesses. Rebecca was returned to Mrs. Anderson's care on March 19, 1980. At that time James and Angelita were still living together. Following this hearing the court continued in effect the temporary orders that had been made and directed that efforts between the welfare department and Angelita continue.

On April 24, 1980, the State filed the motion to terminate the parental rights of Angelita and Michael Anders, the alleged father of Rebecca. The grounds alleged for termination of Angelita's rights were repeated and continued neglect after the adjudication hearing; failure to provide financial support and parental protection; and, as described in the first paragraph of this opinion, that the minor child, Rebecca, had been adjudicated a child described in § 43-202, and reasonable efforts, under direction of the court, had failed to correct the conditions leading to such determination. It further alleged that no efforts have been or are being made by Angelita Roman to correct the existing conditions or to become capable of and accept the care of Rebecca.

After a continuance at Angelita's request the matter was heard on June 1, 1981. Trial was on the record made in the county court. In addition, Angelita testified, as did a young man (not James) with whom she had been living the past 5 months.

Angelita testified that she had separated from James in October 1980. She was currently employed at Monfort packing, earning $6.20 per hour. She acknowledged that she had not accepted the advice of the persons directing her in the care of Rebecca because she wanted to do it her own way. She stated she had had experience in caring for children, her younger sisters, when she was 19 and the youngest sister was 13 or 14. She stated that during the 3 days she had Rebecca in her custody she had "fed her good and bathe[d] her, changed her whenever she needed to." She testified that too many people

had been advising her and this confused her. Her testimony, however, contained no details as to what the contradictory advice was. She testified that she did not make the specified visitations at Mrs. Anderson's because she was working from 3 p.m. until 11 p.m. and was too tired to get up in the morning.

Other evidence indicated Angelita had been working regularly since May 8, 1980. She had separated from James, at first because he had been confined in a treatment center for alcoholics. After his return from the center he then moved out because of the upcoming termination hearing. The evidence also showed that from April 1980 through September 1980 Angelita had made 15 of 20 scheduled visits to the child at the welfare office and that she had attended two of the six parenting classes she was required to attend. Mrs. Anderson was still caring for the child at the time of the termination hearing. Angelita had participated in the care of the child only to a very limited degree and her visits to the Anderson home to see the child before April were usually evening visits of very limited duration. The young man with whom Angelita was currently living testified that he and Angelita had met at Monfort's where they both worked; that if Angelita got the child back and Angelita thought it better that he move out, he would do so; that he gave no financial support to Angelita, only moral support; and that he knew Angelita wanted her daughter back.

The new trial before the district judge took place on August 25, 1981. At this new trial a psychologist and Mrs. Anderson testified. The former stated that she had seen Angelita the day before she testified, twice in August, and once in the months of May, June, and July; that Angelita's personality disorder, described as passive aggressive and which prevented her from asserting herself to protect her child from abuse, still existed, but that her environment had changed. Apparently, the psychologist

was referring to the departure of Steve James and that this minimized the possibility of abuse and neglect.

Mrs. Anderson testified that since she had first seen Angelita her appearance and attitude had changed. She felt Angelita was capable of performing as a mother but would require continuing supervision. She stated that if she had testified at the termination hearing she would not have recommended that parental rights be terminated. Neither Angelita nor her male living companion testified at the new trial.

Rebecca had been removed from Mrs. Anderson's care in November 1980, following the county court's termination of Angelita's parental rights. Since that time, including the period of the new trial, Rebecca has been in another foster home where it is possible for her to remain, if necessary, until she reaches the age of majority.

We point out that the foregoing recital of the proceedings and evidence shows: (1) After approximately 16 months of effort Angelita is not capable of caring for the child without supervision. It is true that Angelita's conclusions are contrary to that evidence, but it is clear that she has made no substantial, practical demonstration of such capability. She was extremely uncooperative in the efforts of others, especially those of Mrs. Anderson, to aid her. (2) Following the end of Angelita's living arrangements with James, she shortly thereafter entered into another such living arrangement with the man who testified on her behalf at the appeal. Nothing is known about this individual except his age, 22, that he is employed, and that he has expressed a willingness to give Angelita his "moral" support. (3) Angelita has not advanced any plan or suggested any method by which Rebecca will be cared for while Angelita works, if the child should be returned to her custody and care.

Against the foregoing stands Angelita's testimony supported by Mrs. Anderson's opinion that the mother does genuinely love the child. A social worker testified the mother's visits to the child up until the time of termination did not have an adverse emotional effect upon Rebecca.

The District Court, in its order of remand to the county court, gave no reasons nor made any findings.

On review de novo we find that the evidence is clear and convincing that, following the determination that Rebecca was a child described in § 43-202(2), reasonable efforts under the direction of the court failed to correct the conditions leading to the determination and, therefore, the judgment of the county court was correct. The judgment of the District Court is reversed and the cause is remanded with directions to reinstate the judgment of the county court.

The above determination makes it unnecessary to consider the State's second assignment of error.

REVERSED AND REMANDED WITH DIRECTIONS.

CLINTON, J., participating on briefs.

BOSLAUGH, J., concurring.

While I concur in the judgment of the court, I disagree with the analysis concerning the issue of whether the order of the District Court was an appealable order.

In *State v. Belding,* 190 Neb. 646, 211 N.W.2d 715 (1973), we held that a dispositive order in a juvenile proceeding is a final order for the purposes of appeal. The order of the District Court in this case would have determined the action if it had been other than a juvenile proceeding. A juvenile proceeding in this circumstance is of necessity of a continuing nature.

CAPORALE, J., dissenting.

I respectfully dissent. There is no question but that Angelita Roman has been demonstrated to have

been a confused and rebellious child-mother whose living arrangements jeopardized the welfare of her own child. There is also no question, on the other hand, that Ms. Roman has matured a great deal and shows signs of being capable of maturing even more and of becoming an adult able to properly rear her daughter.

She has terminated her relationship with the abusive boyfriend, she has obtained and retained gainful employment, she has begun to have frequent visits with her daughter, and she has an emotional tie with the child. It seems to me that under such circumstances it cannot be said that it has been "clearly and convincingly" shown that Ms. Roman has forfeited her right to raise and nurture her daughter. *In re Interest of McKinzie, ante* p. 399, 323 N.W.2d 78 (1982); *Santosky v. Kramer,* 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). I recognize that generally it is in the best interests of a child to make a final determination with respect to terminating parental rights as soon as possible. *In re Interest of Hastings,* 211 Neb. 209, 318 N.W.2d 80 (1982); *In re Interest of Levey,* 211 Neb. 66, 317 N.W.2d 760 (1982). Yet we must not rush to do so until we are satisfied that reasonable efforts have failed to produce a capable parent. Neb. Rev. Stat. § 43-209(6) (Reissue 1978).

The evidence in this case establishes that although Ms. Roman is not yet a fully capable parent, she is making progress in becoming one. We ought not terminate the parental relationship at this time. There is, after all, nothing either in this record or in human experience which teaches that all children removed from an imperfect but reasonably capable and loving parent fare better under the nurturing of the state, or are ultimately adopted by stable, loving parents. I would affirm the holding of the District Court remanding the cause to the county court to

continue the present arrangement for further evaluation of Ms. Roman's progress.

KRIVOSHA, C.J., and WHITE, J., join in this dissent.